# UNITED STATES DISTRICT COURT
### for the
Middle District of North Carolina ▾

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
INFORMATION ASSOCIATED WITH FACEBOOK )
ACCOUNT 100002279346734 THAT IS STORED AT )
PREMISES CONTROLLED BY META PLATFORMS, INC )

Case No. 1:22MJ476

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment "A"

located in the _____ Northern _____ District of _____ California _____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment "B"

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841, 843, 846 | Illegal distribution of controlled substances |

The application is based on these facts:

See attached Affidavit of Special Agent Brian Bradshaw

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/ Brian Bradshaw
_____
*Applicant's signature*

Brian Bradshaw, Special Agent, DEA
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ *(specify reliable electronic means)*.

Date: 12/07/22

_____
*Judge's signature*

City and state: Greensboro, North Carolina

United States Magistrate Judge L. Patrick Auld
_____
*Printed name and title*

UNITED STATES DISTRICT COURT
FOR MIDDLE DISTRICT OF NORTH CAROLINA

| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH FACEBOOK ACCOUNT 100002279346734 THAT IS STORED AT PREMISES CONTROLLED BY META PLATFORMS, INC. | Case No. 1:22 MJ 476 |
|---|---|

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR A SEARCH WARRANT

I, Brian Bradshaw, of the Drug Enforcement Administration (DEA), being duly sworn, depose and say:

## INTRODUCTION & AGENT BACKGROUND

1.      I am an investigative law enforcement officer as a Special Agent of the Drug Enforcement Administration ("DEA"). As such, I am empowered to conduct investigations of and to make arrests for offenses enumerated in Titles 18 and 21 of the United States Code.

2.      This affidavit is offered in support of an application for a search warrant for information associated with a certain Facebook account that is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc. ("Meta"), a company headquartered in Menlo Park, California.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Meta to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the account.

1

3.      I have been employed with the DEA for 17 years and I am currently assigned to the DEA's Charlotte District Office's Tactical Diversion Squad (TDS). I attended and graduated from DEA Basic Agent Training at the DEA Training Academy located in Quantico, Virginia in January of 2006. During this training, I received comprehensive, formalized instruction in matters such as drug identification, detection, money laundering techniques, and asset identification, seizure, and forfeiture. In my capacity as a DEA Special Agent, I investigate federal drug and money laundering offenses under Titles 18 and 21 of the United States Code. During my career, I have been the lead investigator or have participated in many criminal investigations involving violations of the Controlled Substances Act.

4.      I have been involved in undercover investigations of other medical facilities and physicians and their dispensing practices. I have participated in several traditional narcotics and money laundering investigations during my employment at the DEA. I have received training in drug diversion investigations at the DEA Academy in Quantico, Virginia. I have monitored undercover recordings of undercover cooperators, listened to physicians/undercover "patient" conversations, and reviewed and analyzed whether the physicians were dispensing controlled substances for legitimate medical purposes within the bounds of a professional medical practice or not.

## PREMISES TO BE SEARCHED, PROPERTY TO BE SEIZED, AND STATUTES VIOLATED

5.      The DEA and other agencies are investigating the conduct of Dr. Wendell Lewis RANDALL, M.D. This affidavit is offered in support of an application for a search warrant

2

for information associated with Facebook account 100002279346734 (the "Target Account"), registered to RANDALL. The present affidavit provides information establishing probable cause to believe that this account contains evidence of violations of Title 21, United States Code, Sections 841(a), 846, and 843(a)(2).

6. The search warrant, authorized under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), would require Meta to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the Target Account (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

7. My knowledge of the facts alleged in this affidavit are based on a variety of sources, including conversations with other law enforcement officers, including: DEA agents/investigators, detectives from the Mount Airy Police Department, investigators from the North Carolina Medical Board, as well as information received from law enforcement databases and from my personal participation in the investigation. This affidavit does not contain each and every piece of information known to me and other investigators, but rather only information sufficient to establish probable cause to support the requested search warrant.

## JURISDICTION

8. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. See also 18 U.S.C. §§ 2703(a), (b)

3

(1) (A) & (c) (1) (A). Specifically, the Court is "a district court of the United States…that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3) (A) (i).

## PROBABLE CAUSE FOR SEARCH WARRANT

### *General Background*

9.      I have been engaged in an investigation of the dispensing practices of Dr. Wendell RANDALL, M.D. (Doctor of Medicine) as a prescribing medical provider for NATIONAL INSTITUTE OF TOXICOLOGY ("NIT").

10.     The NIT is a Professional Limited Liability Company ("PLLC") formed by Dr. Wendell RANDALL, M.D. in October 2014 in Wilkesboro, North Carolina. At the time of the formation of NIT, RANDALL listed himself as the "Principle" and the purpose of the "PLLC" as being to "perform toxicology studies." Around August/September 2018, RANDALL began offering Pain Management and Medication Assisted Treatment "MAT" to patients from an office location in Mount Airy, North Carolina. "MAT" is the use of medications in combination with counseling and behavioral therapies for the treatment of substance use disorders.

11.     To be valid, a prescription for a controlled substance must be issued by a registered practitioner who is 1) Authorized to prescribe controlled substances by the jurisdiction in which the practitioner is licensed to practice; 2) Registered with the DEA; 3) An agent or employee of a hospital or other institution acting in the normal course of business or employment under the registration of the hospital or other institution which is registered.

4

12.     For a prescription for a controlled substance to be valid, it must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice, as required by Title 21, C.F.R., Section 1306.04.

13.     A combination of federal statutes and regulations control the lawful dispensing or distribution of Schedule II through V controlled substances. The Fourth Circuit, along with other courts, has held that it unlawful for a practitioner to distribute a Schedule II-V controlled substance if the doctor or pharmacist is not acting within the usual course of professional practice in violation of 21 U.S.C. § 841.  See United States v. Tran Trong Cuong, 18 F.3d 1132, 1137 (4th Cir. 1994) ("[A] licensed physician who prescribes controlled substances outside the bounds of his professional medical practice is subject to prosecution and is no different than a large-scale pusher.").

14.     Based on my training and experience, a provider who issues prescriptions for controlled substances, including opioids, and who does not perform a thorough medical examination and evaluation of a patient, is likely acting outside the usual course of professional practice. Also, the North Carolina Medical Board (NCMB) adopted a position statement in November of 1999 (and, later amended in July 2015) entitled "Contact with patients before prescribing." It is the NCMB's position that prescribing drugs to an individual the prescriber has not examined to the extent necessary for an accurate diagnosis is inappropriate, subject to limited exceptions (none of which apply in the instant matter). This requires the prescriber to perform an appropriate history and physical examination, make a diagnosis, and formulate a therapeutic plan, a part of which might be a prescription. This process must be documented appropriately.

5

15.     The DEA has determined certain medications are "controlled" based on their potential for addiction and abuse. The DEA assigns "schedules" to these medications according to their potential for abuse and addiction, with a controlled substance in Schedule II having the highest potential for abuse and addiction. Prescribed medications which are controlled are assigned to Schedules II, III, IV, and V.

16.     As part of the investigation, pharmacy profiles have been reviewed which were obtained from the North Carolina Controlled Substance Reporting System ("CSRS"), administered and managed by the North Carolina Department of Health and Human Services ("NCDHHS"), which detail prescriptions written by RANDALL for patients of NIT. An analysis of RANDALL'S CSRS records, which range from August 1, 2018 until October 3, 2022, show that RANDALL'S daily morphine milligram equivalents (MME) prescribed to NIT patients averaged 90.51 MME/day which, according to the Centers for Disease Control and Prevention (CDC), should be avoided or carefully justified by physicians prior increasing dosages to greater than or equal to 90 MME/day. In addition, evidence obtained from undercover operations detailed below, show that RANDALL and others persons known and unknown who are associated with NIT are involved in the unlawful diversion of controlled substances, in particular Schedule II Opiates such as Oxycodone which are used for the treatment of moderate to severe pain as well as the narcotic drug Suboxone, a Schedule III controlled substance which can be used in the treatment of pain but primarily is used in the treatment of addiction to narcotic pain relievers.

17. I believe that, based upon the facts detailed in this affidavit, there is probable cause to believe that located in the Target Account described herein, there are fruits, evidence, and instrumentalities of criminal offenses against the United States; namely:

   a. Title 21, United States Code, Section 841(a)(1) – that is, knowingly and intentionally distributing or possessing with intent to distribute a controlled substance;

   b. Title 21, United States Code, Section 846 – conspiracy to distribute and/or possess with the intent to distribute controlled substances;

   c. Title 21, United States Code, Section 843(a)(2) – knowingly and intentionally used a registration number that was issued to another person in the course of distributing a controlled substance;

   d. Title 18, United States Code, Section 1956(h) – conspiracy to launder money.

18. Specifically, based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that such violations have been committed by RANDALL and other persons known and unknown who are associated with NIT.

19. As a result of the investigation of RANDALL, I have learned that on October 13, 2014, RANDALL filed Articles of Organization for Professional LLC with the North Carolina Secretary of State for the formation of the National Institute of Toxicology, PLLC. NIT was registered under Secretary of State License ID 1413399 with a Registered Office location at 100 North Bridge Street, Wilkesboro, North Carolina and a listed mailing address for NIT as being PO Box 1239, Wilkesboro, North Carolina. Thereafter, on February 20, 2020, RANDALL filed a "Statement of Change of Registered Office and/or

7

Registered Agent" with the North Carolina Secretary of State changing the address of NIT from 100 North Bridge Street, Wilkesboro, North Carolina to 956 North Main Street, Mount Airy, North Carolina.

20.    As a result of the investigation of RANDALL, I have determined that RANDALL is a 1985 graduate of Southern Illinois University School of Medicine. In 1990, RANDALL completed a Residency at the University of Missouri Hospital and Clinic in Anatomic and Clinical Pathology. In 1992, RANDALL completed a Fellowship at The Armed Forces Institute of Pathology ("AFIP") in Gastrointestinal and Liver Pathology. On September 19, 1992, RANDALL was issued North Carolina Medical License #36016. RANDALL is licensed by the DEA to prescribed Schedule II-V controlled substances under Registration No. BR1131971 in North Carolina. In August 2014 RANDALL requested, and was granted by the DEA, permission to treat up to 30 patients for narcotic dependency under DEA Registration No. XR1131971. In July 2015, RANDALL applied for, and was issued DEA Registration No. FR5376000 in the Commonwealth of Virginia to prescribed Schedule II-V controlled substances. In February 2017, RANDALL requested, and was granted by the DEA, permission to treat up to 100 patients for narcotic dependency under DEA Registration No. XR1131971. In May 2017, RANDALL requested, and was granted by the DEA, permission to treat up to 275 patients for narcotic dependency under DEA Registration No. XR1131971, the maximum allowed by the DEA.

## DEA UNDERCOVER INVESTIGATION

21.    On March 19, 2019, the Honorable L. Patrick Auld, United States Magistrate Judge for the Middle District of North Carolina, issued an Order authorizing the use of undercover

8

operations and other methods in furtherance of the investigation of RANDALL and NIT based on an affidavit of facts, incorporated herein by reference. This Order was renewed on September 18, 2019. The case number assigned by the Court is 1:19MJ98.

22.     On July 30, 2019, at approximately 10:30 AM, the DEA deployed a Task Force Officer, acting in an undercover capacity (hereafter referred to as "UC") into NIT.  Prior to entering into NIT, the UC observed a very crowded parking lot with multiple individuals sitting inside vehicles. Once inside NIT, the UC observed an extremely crowded waiting room in which some patients were sitting on the floor as well as standing due to the available seating being occupied by waiting patients. The UC arrived without an appointment and was unable to be seen because there were no available appointments on this day for walk-ins. The UC explained he/she had traveled from Bristol, Virginia and indicated it was an approximately two (2) hour drive to reach NIT.  The NIT staff member did not question the distance traveled by the UC and instead scheduled an appointment for the UC on September 5, 2019. The staff member did not ask the UC the condition for which the UC was seeking treatment, but provided the UC with new patient forms related to pain management care.

23.     On September 5, 2019, at approximately 11:45 AM, the UC entered into NIT for his/her scheduled appointment. The UC provided NIT with both an undercover driver's license and insurance card for the visit. The UC's co-payment for the NIT visit was $20.00. At the time of the UC's arrival at NIT, the UC observed approximately 15 people seated in the NIT waiting area. While seated in the waiting room area, the UC began speaking with an unknown white female (UWF1) who informed the UC that 90 patients were scheduled

9

to be seen on September 5, 2019 due to the fact that NIT was going to be closed the following day, September 6, 2019. A short time later, the UC was called to the front desk by NIT employee, Jaymee CHANDLER, who checked the UC's blood pressure and heart rate and asked the UC for his/her date of birth, height, and weight. CHANDLER asked the UC if the UC had been prescribed any opiate medications recently to which the UC stated he/she had not. CHANDLER recorded the collected information about the UC on a form then provided the UC with a urine specimen collection cup. After observing urine specimen collection cups containing urine samples on the counter at NIT during the UC's July 30, 2019 visit, the UC assumed he/she would be instructed to provide a urine sample during the September 5, 2019 visit. As such, the UC arrived at his/her September 5, 2019 NIT appointment with a vial of substitute urine that was excreted from a law enforcement individual of the UC's opposite sex, to provide for his/her urine sample. The UC informed CHANDLER that he/she had recently used the restroom and would need to wait a little while before being able to provide a urine sample. The UC took a seat in the NIT waiting room and began a conversation with an unknown white male (UWM1) regarding NIT in general. The UWM1 informed the UC that NIT was a good office where the doctors would give you whatever medications you wanted. However, the UWM1 informed the UC that he was afraid NIT would not be open long because of the types of medications being prescribed and the fact that Mount Airy was a small town and people would begin to complain. The UWM1 also informed the UC that he had a difficult time finding a pharmacy in the Mount Airy area to fill his NIT prescriptions.

24.     Following the conversation with UWM1, the UC began speaking with a second unknown white male (UWM2). UWM2 informed the UC that if the UC tested positive for marijuana that it would not be a problem with RANDALL and that RANDALL would prescribe marijuana to NIT patients if it were legal to do so. The UC then spoke with an unknown Hispanic female (UHF) who advised the UC that she and her husband had just seen the NIT Nurse Practitioner but were waiting for RANDALL to write out her and her husband's prescriptions because the Nurse Practitioner was not allowed to write prescriptions. The UHF informed the UC that the Nurse Practitioner instructs RANDALL on what prescriptions to write out for NIT patients.

25.     The UC was then approached by an unknown white female (UWF2) who was seated in the NIT waiting room area. The UWF2 informed the UC not to worry about failing the urine drug screen and that no one at NIT cared if a patient failed a few of the urine drug screens. Shortly thereafter, the UC decided to enter the NIT restroom to provide a urine sample to continue the appointment process. Once inside the NIT restroom, the UC began the process of removing the substitute urine from the vial when the UC noticed a surveillance video camera in the corner of the room. After observing the surveillance video camera, the UC placed the vial of substitute urine back into his/her clothing and exited the restroom. The UC then exited NIT and spoke with DEA surveillance members about the surveillance video camera in the restroom. The UC then re-entered NIT and a short time later entered into the NIT restroom, poured the substitute urine into the urine specimen collection cup, and placed the urine specimen collection cup into a box with other urine samples that were sitting on the countertop. The UC then returned to the waiting room.

11

26.     Shortly thereafter, the UC was called back to an examination room by Nurse Practitioner Lisa JONES, who was unregistered with the DEA and not authorized to prescribe controlled substances at the time. JONES asked the UC if the UC had taken any narcotics recently and the UC stated no. However, the UC advised JONES that he/she had taken "Roxi's"[1] in the past that the UC obtained from an uncle when the uncle had extra "Roxi's" tablets to spare. JONES asked the UC what milligram the tablets were, and the UC stated he/she believed the tablets were 30 milligrams. JONES then asked the UC to stand up and JONES then listened to the UC's breathing and heart. JONES felt the UC neck area and palpated the UC's back. JONES then looked at the UC's wrist and arms for signs of intravenous drug use. JONES then looked at the UC's eyes and informed the UC that she was looking for signs of trauma. JONES then asked the UC if the UC took any illegal drugs to which the UC stated no. JONES asked the UC if the UC had any other pain other than back or hip, and if it hurt for the UC to move his/her neck around and touch his/her toes. The UC informed JONES that the UC had no other pains. The UC advised JONES that he/she could probably touch his/her toes, but JONES did not have the UC do so.

27.     JONES then asked the UC some general health questions about high blood pressure, cholesterol, allergies, etc. The UC informed JONES that he/she has depression over pain. JONES then informed the UC that the only allowable illegal substance that could be found in the UC's system would be marijuana and that both JONES and RANDALL believed

---

[1] "Roxi's" is a common slang term referring to Roxicodone, a brand name for oxycodone hydrochloride tablets manufactured by Mallinckrodt.

marijuana should be legal. JONES informed the UC that if a substance is not prescribed to the UC then the substance should not be in the UC's system. JONES further informed the UC that the UC would have to come back in a couple of weeks to see ADAMS, the NIT counselor, and provide information about any legal or illegal drug use in the past. The UC observed the packet that JONES was documenting information on and observed that the first page had the UC's urine drug screen results. The UC observed several narcotics listed on the form and that the UC's test results were listed as negative. The UC also noted that his/her substitute urine temperature was listed as being 90 degrees. JONES then asked the UC if the UC had any problems with the police to which the UC stated he/she did not think so. JONES then asked the UC to rate his/her daily pain, and the UC stated his/her daily pain was about a 7 on a scale of 1 to 10 with 10 being the most pain. JONES then asked the UC what his/her highest level of pain was, and the UC stated a 9.

28.     JONES then informed the UC that RANDALL would be the NIT medical provider who actually prescribed a medication to the UC. JONES exited the examination room and returned approximately 5-10 minutes later. JONES advised the UC that because the UC had not taken any medications for a while that RANDALL was prescribing the UC with Tramadol, a Schedule IV controlled substance used to treat moderate to severe pain, three times a day to start out. The UC informed JONES that Tramadol made the UC break out in hives. JONES then informed the UC that she would go back and speak with RANDALL to see if RANDALL wanted to change the Tramadol prescription to another drug. JONES returned a short time later and informed the UC that RANDALL was only going to prescribe the UC with Narcan, a prescription nasal spray medication used in the treatment

13

of a known or suspected opioid overdose, this visit and nothing for pain. JONES instructed the UC to return to NIT in two (2) weeks and that NIT would ensure that the UC's drug screen was clean. The UC exited the examination room and went to the front desk where the UC received a return appointment for September 18, 2019, at 3:20 PM. At 2:19 PM, the UC exited NIT. During the time the UC was inside NIT, DEA surveillance members observed numerous individuals enter and exit NIT and perform actions in the parking lot consistent with intravenous drug usage, to wit, possessing a needle, searching for veins, and tying off the vein with a ligature.

29.     On September 18, 2019, at approximately 2:45 PM, the UC returned to NIT for his/her second appointment. During this visit, rather than use an undercover insurance card, the UC paid $150.00 in cash for his/her visit. After filling out some paperwork regarding the UC's personal identifiers and pain assessment, the UC took a seat in the waiting room area. Shortly thereafter, the UC was called to the front counter and provided a urine specimen collection cup. The UC then entered into the NIT restroom and provided dog urine, which was secreted into the clinic by the UC in a vial taped to the UC under the UC's clothing. After pouring dog urine into the urine specimen collection cup, the UC then placed the urine specimen collection cup into a box with other urine samples that were sitting on the countertop and went back to the waiting room area.

30.     While seated in the waiting room area, the UC began speaking with an unknown white male (UWM3) who informed the UC that NIT was the easiest place he had ever been to. UWM3 informed the UC that if an NIT patient has their visit with an NIT nurse, the NIT patient would have to wait for RANDALL to write their respective prescription

14

because the nurse could not write prescriptions. Shortly thereafter, the UC was called to the front desk area by Star LNU. The UC informed Star LNU that the prescription for Narcan that the UC received on September 5, 2019 was not filled by the UC. Star LNU then checked the UC's blood pressure and pulse. Not long afterwards, the UC was directed to go to the NIT kitchen area to speak with NIT counselor ADAMS. ADAMS asked the UC about his/her hip and lower back pain. ADAMS asked the UC about past narcotic drug usage for pain and about any depression the UC may have or had. After a brief conversation about other pain clinics RANDALL was associated with in Virginia and other states where ADAMS counsels patients, the UC returned to the waiting area.

31.     In the waiting area, the UC began speaking with an unknown white male (UWM4) who informed the UC that this was the UWM4's second visit to NIT and that the UWM4 had been kicked out of his previous pain clinic. UWM4 further informed the UC that UWM4 had failed his first urine drug screen at NIT and that NIT informed UWM4 that as long as UWM4 did not test positive for cocaine or methamphetamine, UWM4 had nothing to worry about. UWM4 also informed the UC that Tramadol was prescribed to UWM4 on his first visit to NIT. Shortly thereafter, the UC was called to a NIT examine room by Nurse Practitioner Sylvia JACKSON. JACKSON asked the UC the reason for the UC's visit to which the UC responded hip and back pain. The UC also informed JACKSON that the UC was allergic to Tramadol and was currently taking 10 Motrin[2] per day for pain. JACKSON left the examination room and was overheard by the UC speaking with RANDALL. Shortly

---

[2] Manufacturer directions regarding dosage of Motrin warn not to exceed 6 caplets in a 24-hour period.

thereafter, JACKSON re-entered the examination room and provided the UC with a prescription for Norco 5-325mg #42, a Schedule II highly addictive opioid narcotic used to treat moderate to severe pain. The UC's encounter with JACKSON lasted less than four (4) minutes, during which JACKSON performed no examination nor discussed the UC's reported ailments. A third NIT appointment, which the UC did not go to, was made for October 3, 2019.

32.     On October 23, 2019, a federal search warrant was executed at NIT. Seized pursuant to the warrant were documents, digital evidence, controlled substances and any other evidence in furtherance of a conspiracy to distribute pharmaceutical controlled substances, a conspiracy to commit healthcare fraud, money laundering, and maintaining a drug-involved premises by NIT. One of the items of digital evidence seized was an iPhone 10 belonging to RANDALL.

33.     In September of 2021, a former Nurse Practitioner who was employed at NIT from April 2020 through November 2021, hereafter referred to as Source of Information "SOI-1" contacted the DEA and identified RANDALL as a prescriber of Schedule II narcotics with a high. SOI-1 stated RANDALL consistently prescribed over 100 MME per day to NIT patients during SOI-1's employment at NIT. As per the Centers for Disease Control and Prevention (CDC), patients who died of opioid overdose were prescribed an average of 98 MME/day, while other patients were prescribed an average of 48 MME/day. The CDC recommends providers use extra precautions when increasing a patient to greater than or equal to 50 MME/day and avoid or carefully justify increasing dosage to greater than or equal to 90 MME/day. SOI-1 further stated to investigators that RANDALL does not

require medical documentation to support the need for NIT patients to be prescribed controlled substances.

34.     In November of 2021, a former Office Manager who was employed at NIT from approximately December 2019 until October 2021, hereafter referred to as Source of Information "SOI-2," was contacted by the DEA. When SOI-2 began employment at NIT in late 2019, SOI-2 stated seventy to eighty patients would be seen per day at NIT. SOI-2 noted that on many days, there would be long lines of patients between the hours of 9:00 AM – 8:30 PM waiting to be seen by a NIT medical provider. SOI-2 stated most NIT patients did not have prior medical history paperwork in their respective NIT patient file to justify the types of medications being prescribed by NIT medical providers. When SOI-2 stated he/she would contact prior medical providers of newly established NIT patients, many times SOI-2 stated he/she was informed by the prior medical providers office that the newly established NIT patient in question had been discharged due to failed drug screens.

35.     SOI-2 stated RANDALL accepted everyone as a patient at NIT and SOI-2 attributed RANDALL's greed of money as the reason. SOI-2 further stated that, in SOI-2's opinion, quite a few of NIT patients appeared to be drug seekers. SOI-2 estimated that approximately twenty percent of NIT pain patients were actually legitimate pain patients while the remaining eighty percent appeared to be drug seekers. SOI-2 stated while he/she was the Office Manager at NIT, SOI-2 implemented a NIT policy whereby any NIT patient who did not have proper documentation in their respective NIT patient file had thirty days to visit a primary care physician to obtain the justifying documentation to warrant the

17

medications being prescribed by NIT. As a result of the policy implemented by SOI-2, SOI-2 stated NIT's daily patient load dropped to approximately forty to fifty patients per day. SOI-2 noted that if a NIT Nurse Practitioner, who actually had prescribing authority via a valid DEA Registration number, did not feel comfortable prescribing a certain type or amount of medication to a NIT patient, that particular patient's prescription would be prescribed by RANDALL, although it was very unlikely that RANDALL conducted an in-person visit with the patient on the day in which the particular NIT prescription was prescribed.

36.    SOI-2 noted that if a NIT Nurse Practitioner refused to prescribe a NIT patient pain medication or a certain amount of pain medication, it was not uncommon for the NIT patient to walk out of the NIT examination room where the Nurse Practitioner was and walk directly to RANDALL'S office, sometimes actually walking around SOI-2, despite being told by SOI-2 that the patient was not allowed to go into RANDALL'S office. SOI-2 stated RANDALL would then prescribe the type of medication or amount of medication that the Nurse Practitioner refused to prescribe to the NIT patient in question. SOI-2 further noted that some NIT patients had RANDALL'S personal cellular telephone number and that those particular NIT patients would call RANDALL from time-to-time to have RANDALL prescribe them with prescriptions for controlled substances.

37.    On August 24, 2022, the government interviewed Charles "Chuck" ADAMS, a former NIT counselor who was employed at NIT until July 2021. During ADAMS' career as a counselor, ADAMS never obtained the required counseling credentials needed to bill insurance companies for counseling services. ADAMS stated it was common practice for

18

RANDALL to write prescriptions for controlled substances to NIT patients that RANDALL never had a face-to-face encounter with. ADAMS further stated that when other NIT medical providers did not feel comfortable writing prescriptions to a NIT patient for controlled substances or to NIT patients who did not have the proper medical documentation or a valid reason to receive pain medication, RANDALL would write a prescription for the particular patient anyway. ADAMS stated every NIT patient was billed for 21+ drug classes on their urine screens so NIT would be able to bill the patient's insurance company for the most money possible. ADAMS stated RANDALL disregarded the test results of the urine screens and did not use the test results to discharge patients, make medical decisions, or change prescribing habits. ADAMS stated RANDALL was aware NIT patients would use urine from other individuals to pass the NIT urine drug screens. ADAMS gave an example of a NIT patient testing positive for methamphetamine six (6) times and RANDALL continuing to prescribe controlled substances to the particular patient and refusing to discharge the patient.

38.     On June 9, 2021, your affiant took part in an interview of Tonya May, who is known to your affiant as a former billing manager for RANDALL at NIT. Mrs. May stated she began working full-time for RANDALL in 2018 and did so until May of 2020. During the interview, Mrs. May stated that all NIT patients were billed under RANDALL'S name regardless of whether RANDALL or a NIT Nurse Practitioner ("NP") actually saw the patient. Mrs. May noted that insurance companies paid a higher amount for patients seen by a Medical Doctor "M.D." versus a "NP." Mrs. May also noted that all NIT patients were

given a 21+ class drug screen for each visit made to NIT, which resulted in NIT charging the maximum billing amount to the NIT patient's insurance company for drug screens.

39.     Mrs. May claimed her salary while working for RANDALL at NIT was 5% of the total insurance billing for the month or a maximum of $10,000.00 per month. Mrs. May noted that her salary the last five (5) to six (6) months at NIT was $10,000.00 per month.

40.     In August of 2022, the DEA learned that RANDALL opened a second NIT location in Wilkes County, North Carolina. The DEA learned of RANDALL'S second NIT location when Lisa JONES, a former Nurse Practitioner for NIT, applied for a new DEA registration number with a registered practice location address of 43 Boone Trail, North Wilkesboro, North Carolina. When investigators reviewed this address, it was found to be a newly-opened second location for NIT. This was confirmed by a new website created for NIT, www.nitpllc.biz, that lists both the Mount Airy and North Wilkesboro, North Carolina locations, as well as surveillance conducted by the Wilkes County Sheriff's Office.

**INFORMATION ON TARGET ACCOUNT**

41.     The Target Account is a mobile application that enables chat, voice, and video communication between the social media site's web-based messaging and smartphones that has an essential storage component.

42.     A forensic extraction was conducted on RANDALL'S iPhone 10 and a search of the messages archived in the Facebook Messenger chats section of the download revealed that RANDALL was using the Facebook Messenger application associated with the Target Account to communicate with NIT patients and staff for things such as requests for early

refills of medication, assistance in scheduling medical appointments, and communicating with NIT staff concerning the credentialing of insurance for billing purposes.

43.     On Thursday, May 16, 2019 via Facebook Messenger, RANDALL had the following electronic communication with a NIT patient, hereafter referred to as Patient #1:

> Patient #1 – "Exit 79 Top of ramp turn left I'm across the bridge on the right. I didn't move to the BP I just stayed at the 76 station"

44.     A review of the North Carolina Controlled Substance Reporting System ("NCCSRS") indicated that on Thursday, May 16, 2019, RANDALL prescribed Patient #1 with two (2) prescriptions. The first prescription being for Oxycodone 20mg #35, a Schedule II controlled substance used to treat severe pain and the second prescription being for Clonazepam 1mg #84, a Schedule IV controlled substance used to treat seizures, panic disorder, and anxiety. The NCCSRS further indicated that Patient #1 filled the Oxycodone prescription on Saturday, May 18, 2019 and the Clonazepam prescription on Friday, May 24, 2019.

45.     According to the NCCSRS, RANDALL prescribed the Oxycodone and Clonazepam prescriptions to Patient #1 two (2) days sooner than the instructions Randall had on the prior month's prescriptions for the noted medications to Patient #1.

46.     On Tuesday, August 27, 2019 via Facebook Messenger, RANDALL had the following communication with a NIT patient, hereafter referred to as Patient #2:

> Patient #2 – "Dr randall can we work something out so I can get my meds until my appt next Thursday? I ran out of my meds last week, I really need them, is there any way you could call a 5 day supply or enough to last me until my appt next Thursday, September 5."
>
> RANDALL – "I will check on it after arriving at the office today."

21

47.    A review of the NCCSRS indicated that on Tuesday, August 27, 2019, RANDALL prescribed Patient #2 with Subutex 8mg #30, a Schedule III controlled substance used to treat pain as well as addiction to narcotic pain relievers. The NCCSRS indicated that Patient #2 filled the Subutex prescription on Tuesday, August 27, 2019.

48.    On Friday, October 18, 2019 via Facebook Messenger, RANDALL had the following electronic communication with a NIT patient, hereafter referred to as Patient #1:

> Patient #3 - "Hello, Dr. Randall I truly apologize for reaching out via FB, but I have lost the cell phone number you gave me earlier this year. I know this is unethical but I have been trying to reach you at the office. I got a letter of dismissal and when I called Jayme said it was because I was in the wilkes round up. I've had 20+ reach out concerned about the name in the paper. Obviously that girl is NOT me. It shows her photo, age, and address. Someone sent me a copy of her photo which I'm forwarding to you now since the front desk never got back to me as promised. I'm worried because my appointment is scheduled for Monday. Again I apologize for this message but I didnt want you to think it was me and lower your opinion of me. Thank you for your time and years of serving me"

> RANDALL – If it's wrong it will be corrected. Keep your appointment. I will address with staff on Monday. Sorry for any inconvenience. Thank you"

49.    According to the NCCSRS, on Monday, October 21, 2019, RANDALL prescribed Patient #3 with prescriptions for Oxycodone 15mg #56 and Carisoprodol 350mg #90, a Schedule IV controlled substance used to treat short term muscle pain. The NCCSRS indicated that Patient #3 filled both the Oxycodone and Carisoprodol prescriptions on Monday, October 21, 2019.

50.    On September 9, 2019 via Facebook Messenger, RANDALL had the following electronic communication with NIT staff member Tonya May:

> Tonya May – "What's the web address for that?"

Tonya May – "I find out we have to credential with healthy blue. They are sending me the packet"

RANDALL – "Is there time?"

Tonya May – "Yes. Since they pushed it out"

Tonya May – "The lady assured me we have time"

RANDALL – "Please get it done ASAP. Thank you."

RANDALL – "Can you do it online?"

Tonya May – "Not sure yet. Awaiting the packet."

51.     As a result of my training and experience, patterns of prescribing high volumes of controlled substances and/or high dosages of opioids to a large number of patients is a cause for concern because it is consistent with illicit drug diversion, i.e., it is unlikely that such high dosages are medically indicated for most patients, and therefore it is indicative of patients obtaining medications to resell or abuse. Furthermore, it has been disclosed by several Sources of Information "SOIs," one of which is a licensed medical provider who previously worked for RANDALL at NIT, that RANDALL prescribes controlled substances with no legitimate medical purpose, in violation of Title 21, C.F.R. §1306.04, which states, "A prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice."

52.     I have been involved in the investigation of various individuals and organizations involved in the manufacturing, distribution, and use of controlled substances. I have

23

conducted surveillance operations and have become familiar with the methods used by individuals engaged in the manufacturing, trafficking, and use of controlled substances.

53.     Based on my training and experience, the unlawful distribution of controlled substances to a population of patients likely to abuse and divert these substances can lead to patient harm, e.g., non-fatal overdose or death, and presents a significant danger to both these patients and the public at large.

54.     Based on my experience, I am aware that medical providers who illegally prescribe or otherwise traffic in narcotics use online applications associated with their legitimate medical practice as a means of committing their crime. These applications can also store evidence related to the crime. By way of example, these can include (1) electronic health records for patients, which often contain evidence related to patients receiving an unusual amount of certain drugs; (2) point of sales transaction systems that can allow law enforcement to trace suspicious transactions; (3) cloud storage provided by Apple and other vendors which can store incriminating documents related to the practice (e.g., contradictory records, drug ledgers, etc.); (4) appointment and scheduling software which can retain records of unusual appointments or lack of appointments for individuals still receiving drugs from the medical provider; and (5) electronic communication between a provider and patient.

55.     Furthermore, I am aware that individuals who use their medical practice as part of a drug trafficking enterprise often store, purposely or inadvertently, evidence related to their drug trafficking on online application systems. For instance, doctors engaging in drug trafficking through improper prescriptions may include electronic communications in their

24

online application accounts detailing certain prescription drugs going to patients who lack an underlying medical condition which warrant the prescription(s).

## GENERAL INFORMATION REGARDING FACEBOOK

56. Meta Platforms, Inc., a company headquartered in Menlo Park, California, owns and operates Facebook, a free-access social networking website that can be accessed at http://www.facebook.com. Facebook users can use their accounts to share communications, news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

57. Meta asks Facebook users to provide basic contact and personal identifying information either during the registration process or thereafter. This information may include the user's full name, birth date, gender, e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Each Facebook user is assigned a user identification number and can choose a username.

58. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News

Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

59.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

60.     Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

61.     Facebook users can upload photos and videos to be posted on their Wall, included in chats, or for other purposes. Users can "tag" other users in a photo or video, and can be

26

tagged by others. When a user is tagged in a photo or video, he or she generally receives a notification of the tag and a link to see the photo or video.

62.     Facebook users can use Facebook Messenger to communicate with other users via text, voice, or video. Meta retains instant messages and certain other shared Messenger content unless deleted by the user and also retains transactional records related to voice and video chats. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.

63.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

64.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (i.e., non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

65.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

66.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

67.     Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

68.     In addition to the applications described above, Meta provides users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

69.     Meta also retains records of which IP addresses were used by an account to log into or out of Facebook, as well as IP address used to take certain actions on the platform. For example, when a user uploads a photo, the user's IP address is retained by Meta along with a timestamp.

70.     Meta retains location information associated with Facebook users under some circumstances, such as if a user enables "Location History," "checks-in" to an event, or tags a post with a location.

71.     Social networking providers like Meta typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Meta about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Meta typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

28

72. As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Meta, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Meta logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, location information retained by Meta may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and

29

intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

73.     Therefore, the servers of Meta are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## **CONCLUSION**

74.     Based upon my training and experience, and the training and experience of others upon whom I have relied, I know that physicians who engage in improper prescribing practices will exhibit a combination of indicators that, in concert, are indicative of improper prescribing of controlled substances. Here, the lack of any physical examination or even discussions between the medical providers and the undercover officer strongly support the conclusion that prescriptions were issued, through NIT, without a legitimate medical purpose by RANDALL who was acting outside the usual course of his professional practice.

75.     Accordingly, based upon the above information, I believe that there is probable cause to believe that RANDALL, through NIT, is distributing/dispensing controlled substances for no legitimate medical purpose and outside the course of normal medical practice in violation of Title 21, United States Code, Sections 841(a), 846, and 843(a)(2).

76.     I believe that communications between RANDALL and NIT patients via Facebook Messenger, which are maintained by Meta, will contain fruits, evidence, and instrumentalities of criminal offenses against the United States.

77.     Based on the above facts, I submit that there is probable cause to believe that relevant evidence relating to violations of Title 21, United States Code, Sections 841(a), 846, and 843(a)(2) will be found in the Target Account operated by service provider Meta. Accordingly, I seek a search warrant to seize all of the records and other materials listed in Attachment B located within the Target Account.

78.     IT IS REQUESTED that the Court authorize the offsite search of said storage, media, records, and documents (further described in Attachment B) seized pursuant to the execution of this warrant. The requested authorization will allow the executing agents to remove the seized items to an appropriate forensic facility outside the jurisdiction of the court, if necessary, for proper analysis of the seized items.

79.     WHEREFORE, based upon the facts set forth in this Affidavit, it is requested that the Court issue a Search Warrant authorizing the search of the Target Account operated by Meta (further described in Attachment A) pursuant to Rule 41 of the Federal Rules of Criminal Procedure. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

/s/ Brian N. Bradshaw  by CDA

BRIAN N. BRADSHAW
SPECIAL AGENT
DRUG ENFORCEMENT ADMINISTRATION

31

In accordance with Rule 4.1(b)(2)(A), the Affiant attested under oath to the contents of this Affidavit, which was submitted to me by reliable electronic means, on this ___ day of December, 2022, at _____

Signature of Judge

US Magistrate Judge

Title of Signing Officer
United States District Court

## **ATTACHMENT A**
### **Property to Be Searched**

This warrant applies to information associated with Facebook account 100002279346734

that is stored at premises owned, maintained, controlled, or operated by Meta Platforms,

Inc., a company headquartered in Menlo Park, California.

# ATTACHMENT B
## Particular Things to be Seized

**I.      Information to be disclosed by Meta Platforms, Inc. ("Meta")**

To the extent that the information described in Attachment A is within the possession, custody, or control of Meta, regardless of whether such information is stored, held or maintained inside or outside of the United States, and including any e-mails, records, files, logs, or information that has been deleted but is still available to Meta, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Meta is required to disclose the following information to the government for each account or identifier listed in Attachment A ("Account"):

a.  All records and other information relating to the Account, including but not limited to the following:

b.  All contact and personal identifying information, including: full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

c.  All activity logs for the account and all other documents showing the user's posts and other Facebook activities from October 23, 2019 until December 5, 2022;

d.  All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them from October 23, 2019 until December 5, 2022, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

34

e.  All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

f.  All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string;

g.  All other records and contents of communications and messages made or received by the user from October 23, 2019 until December 5, 2022, including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

h.  All "check ins" and other location information;

i.  All IP logs, including all records of the IP addresses that logged into the account;

j.  All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

k.  All information about the Facebook pages that the account is or was a "fan" of;

l.  All past and present lists of friends created by the account;

m. All records of Facebook searches performed by the account from October 23, 2019 until December 5, 2022;

n. All information about the user's access and use of Facebook Marketplace;

o. The types of service utilized by the user;

p. The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

q. All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

r. All records pertaining to communications between Meta and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

Meta is hereby ordered to disclose the above information to the government within fourteen days of issuance of this warrant.

## II.    Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of 21 U.S.C. §§ 841(a)(1), 846, and 843(a)(2), and 18 U.S.C. § 1956(h) involving Dr. Wendell Lewis RANDALL, M.D. since October 23, 2019 for each account or identifier listed on Attachment A, in the form of the following:

a. Any prescriptions, communications, documents, records, notes, ledgers, audio files, videos, calendar entries, and photographs in electronic format, or other electronic

36

data referencing the importation, transportation, ordering, purchasing, shipping, and distribution of controlled substances or their analogues or the proceeds thereof, including evidence establishing the identities of any persons involved in the importation, transportation, ordering, purchasing, shipping, and distribution thereof, indicative of prescribing outside the usual course of professional practice;

b. Any information referencing the types, amounts, and prices of controlled substances or their analogues trafficked as well as dates, places, and amounts of specific transactions; any data reflecting names (including, but not limited to, subscriber names, user names, and screen names), addresses (including, but not limited to, mailing addresses, residential addresses, business addresses, and email addresses), telephone numbers, and other identifying information of co-conspirators, sources of drug supply, and drug customers, indicative of prescribing outside the usual course of professional practice;

c. The identity of the person(s) who created or used the Target Account, including records that help reveal the whereabouts of such person(s);

d. Any bank records, bank account information, credit card account and account information, and other electronic financial records and all identifying information for the same referencing the importation, transportation, ordering, purchasing, and distribution of controlled substances or their analogues and/or money laundering as well as medical services;

e. Evidence that identifies individuals who communicated with the Target Account about prescriptions.